UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
EVE SAINT, as Guardian Ad Litem for her son
THOMAS SAINT,                                                    MEMORANDUM OF
                                                                DECISION AND ORDER

                                    Plaintiff,

            - against -                                         CV 04-2118 (ADS)
                                                                Action No. 1

UNITED STATES OF AMERICA,

                                    Defendant.
------------------------------------------------------------------------x
NATIONWIDE MUTUAL INSURANCE COMPANY
a/s/o/ THOMAS SAINT,

                                    Plaintiff,

            - against -                                         CV 04-2221 (ADS)
                                                                Action No. 2

UNITED STATES OF AMERICA,

                                    Defendant.
------------------------------------------------------------------------x

A P P E A R A N C E S :

        HANLY CONROY BIERSTEIN SHERIDAN, FISHER & HAYES, LLP
        Attorneys for Plaintiff Eve Saint
        415 Madison Avenue
        New York, NY 10017
        By:     Clinton B. Fisher, Esq. and
                Gregory Hach, Esq., of Counsel

        D'AMBROSIO & D'AMBROSIO, P.C.
        Attorneys for Plaintiff Nationwide Mutual Insurance Co.
        42 Main Street
        Irvington, NJ 10533
        By:     James D'Ambrosio, Esq., of Counsel

**ROSLYNN B. MAUSKOPF**
**United States Attorney**
**Eastern District of New York**
**610 Federal Plaza**
**Central Islip, NY 11722**
**By:    Vincent Lipari, Assistant United States Attorney**

**SPATT, District Judge.**

This decision is rendered following a four day non-jury trial.  This is an action brought under the Federal Tort Claims Act ("FTCA") 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 2674 et seq. to recover damages for personal injuries to Thomas Saint, the son of Eve Saint, his mother and guardian ad litem.

The time was June 7, 2002 at about 6:20 a.m.  The location was at the intersection of Route 110 and the north service road of the Long Island Expressway ("LIE").  At that time and place, there was a collision between a tractor-trailer ("T-T") owned by the United States Postal Service ("USPS") and operated by Mark P. Arbucci and a Lincoln automobile operated by twenty year old Thomas Saint ("Saint").  This action to recover damages for personal injuries is brought on behalf of Thomas Saint by his mother, Eve Saint as Guardian Ad Litem for her son.

Other than the speed of the respective vehicles and the damages issues, virtually all of the material facts in regard to the collision are undisputed.  The T-T was being operated by Arbucci in a southbound direction on Route 110.  The Lincoln car was being operated by Saint in a northbound direction on Route 110.

As the Lincoln car approached the intersection of Route 110 and the north service road of the LIE it moved into the left turn lane and made a left turn and entered the intersection. The T-T, proceeding south, came into contact with the right side of the Lincoln car. There was a severe impact.

Following the collision, the Lincoln car traveled approximately 250 feet, having crossed the grass median dividing Route 100, traversed the northbound lanes of Route 110 and came to a rest on the easterly sidewalk against a metal barrier. The Lincoln car sustained substantial damages to the right side of the car at the initial impact with the T-T, and also, substantial damages to the front of the car when it ended up colliding with the easterly metal barrier. After the collision, the T-T traveled approximately 372 feet and came to a stop in the extreme right southbound lanes of Route 110 near the southbound entrance for the LIE.

As to the weather, it was raining heavily and the streets were wet. At the time of the collision, the traffic lights at the intersection were green for both northbound and southbound traffic on Route 110. There was a green turn arrow facing the Lincoln car as it was proceeding northbound just prior to its turn. However, this turn arrow was not green at the time the Lincoln car turned left.

All of these facts are virtually undisputed. As to liability, the real triable issues are the speeds of the two vehicles, prior to and at the time of the collision.

# I. <u>THE FEDERAL TORT CLAIMS ACT</u>

A complaint states a cause of action under the FTCA if it presents a claim that is "[1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 477, 114 Sup. Ct. 996, 1001, 127 L.Ed.2d 996 (1994) (quoting 28 U.S.C. § 1346(b)).

The Supreme Court has consistently held that the reference in Section 1346(b) to the "law of the place" means the law of the State which is a source of substantive liability. *Id*. at 478*; see also*, *e.g.*, *Miree v. DeKalb County,* 433, U.S. 25, 29 n.4, 97 Sup. Ct. 2490, 2491 n.4, 53 L.Ed.2d 537 (1977); *United States v. Muniz*, 374 U.S. 150, 153, 83 Sup. Ct. 1850, 1852, 10 L.Ed.2d 805 (1963); *Rayonier, Inc. v. United States,* 352 U.S. 315, 318, 77 Sup. Ct. 374, 376, 1 L.Ed.2d 354 (1957). In this case, the law of the State of New York governs the actions of the parties.

## II.    <u>LIABILITY - AS TO THE LEFT TURN BY THOMAS SAINT IN THE LINCOLN CAR</u>

The movement of Saint's Lincoln car as it approached the intersection was governed by the New York Vehicle and Traffic Law ("VTL"), § 1141, which

provides as follows:

> § 1141.  Vehicle Turning Left
> The driver of a vehicle intending to turn to the left within an intersection . . . shall yield the right of way to any vehicle approaching from the opposite direction which is within the intersection or so close as to constitute an immediate hazard.

The violation of this statute, which provides that a left-turning automobile must yield to oncoming traffic, constitutes negligence per se.  *Ciatto v. Lieberman*, 266 A.D.2d 494, 495, 698 N.Y.S.2d 54 (2d Dep't 1999).

Both vehicles approached the intersection facing green signal lights.  New York Vehicle & Traffic Law § 1111(a)(1) provides:

> (a) Green indications:
> 1.  Traffic, except pedestrians, facing a steady circular green signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn.  Such traffic, including when turning right or left, shall yield the right of way to other traffic lawfully within the intersection or an adjacent crosswalk at the time such signal is exhibited.

Under the provision of VTL § 1111(a) (1), at an intersection, Saint could properly turn left on a solid green light even if the green turning arrow was not lit, provided he complied with the provision of VTL § 1141.  Saint should have yielded the right of way to the USPS T-T, and failed to do so.  Therefore, Saint violated the provisions of VTL § 1141.  However, the plaintiff contends that Mark Arbucci, the USPS driver was also negligent and bears a share of the total responsibility for the accident, because the USPS vehicle was traveling at an excessive rate of speed on a rainy day on a wet road, namely at least 60 miles per

hour on a road where the speed limit was 55 miles per hour.

Another statute involved in this case is VTL § 1180(a), (b) and (e) which states:

> (a) No person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing;
>
> (b) Except as provided in subdivision (g) of this section and except when a special hazard exists that requires lower speed for compliance with subdivision (a) of this section or when maximum speed limits have been established as hereinafter authorized, no personal shall drive a vehicle at a speed in excess of fifty five miles per hour;
>
> (e) The driver of every vehicle shall, consistent with the requirements of subdivision (a) of this section, drive at an appropriate reduced speed when approaching and crossing an intersection . . . and when any special hazard exists with respect to pedestrians, or other traffic by reason of weather . . .."

In a recent Second Department case the Court reviewed the rules with regard to a left turning vehicle at an intersection with a green light. In *Gabler v. Marly Bldg. Supply Corp.*, 27 A.D.3d 519, 520, 813 N.Y.S.2d 120 (2d Dep't 2006), it was held that the straight driving vehicle had the right of way and the driver "was entitled to anticipate that the plaintiff would obey the traffic laws which required him to yield to the defendant's vehicle." In *Gabler* the plaintiff left turning driver conceded that he never saw the defendant's vehicle prior to making his left turn and it was held that he "was negligent as a matter of law in failing to see that which he should have seen through the proper use of his

6

senses." *Id.* Here, there is no such proof of Saint not seeing the defendant's vehicle.

It is also axiomatic that not every left turning driver is totally responsible for a collision with a straightaway driver. In *Luck v. Tellier*, 222 A.D.2d 783, 784-785, 634 N.Y.S.2d 814, 815 (3d Dep't 1995), the defendant driver of a left turning vehicle, that crossed in front of the plaintiff's straightaway motorcycle, pleaded guilty to violating VTL § 1141. However, at the personal injury trial, the defendant driver denied that he was negligent, claiming that it was foggy and raining at the time of the collision and that he never saw the plaintiff motorcycle because its light was "dim." In denying the plaintiff's motion for summary judgment, the Court held that, notwithstanding the plea of guilty to VTL § 1141, the defendant was not foreclosed from proving that he "exercised reasonable care in an effort to comply with the statute, and, thus, his failure to do so should be excused." *Id.*

### III. <u>THE TRIAL</u>

A)      <u>As to Liability</u>

In an effort to ascertain whether there is any liability on the part of the T-T driver, the Court will now review what it considers to be the material testimony on this issue.

(1)      <u>The Plaintiff's Case on Liability</u>

Kevin R. Theriault is an accident reconstruction expert. He was the only

witness for the plaintiff on the issue of liability. He is trained in the field of accident reconstruction. In his field, he has done more than 850 accident reconstructions and over 700 of those situations involved tractor trailers. Theriault was retained in this matter by plaintiff's counsel and provided with the police reports, police photographs and statements from the T-T driver and an independent witness, one John Widecki. The police reports state that an "apparent contributing factor is Saint's failure to yield right of way." The police reports do not attempt to reconstruct the accident and make no determination as to the speed of the drivers.

Theriault visited the accident site on April 10, 2005, mapped the roadway dimension and prepared a diagram. After making certain calculations, he estimated Saint's speed during the turn was between 10 and 15 miles per hour and the distance from the left turn stop bar to the point of impact was approximately 59½ feet. Theriault estimated that Saint made the turn in between 2.7 and 4 seconds. This amount of time was enough for an experienced commercial driver, traveling at a reasonable speed, to perceive the potential danger and slow down sufficiently to allow Saint to complete the turn. The Court agrees.

Theriault did a more interesting calculation in his determination of the speed of the T-T. Fortified by many photographs, he reached that determination based on two factors: (1) the post-impact movement of the T-T and (2) the post

impact movement of the Lincoln.  The T-T traveled 372 feet from the impact to its final resting place.  Without any braking by the T-T, Theriault estimated that it was traveling at a maximum speed of 56.1 miles per hour.  However, the T-T driver testified that immediately upon the point of impact he slammed on his brakes as hard as he could for 3 to 4 seconds.  Theriault calculated that if the T-T braked all the way from impact to final rest 372 feet away, his maximum speed was 68.4 miles per hour.  However, the T-T driver testified that he did not keep his foot on the brake all the way.  In that regard, Theriault estimated the speed of the T-T between 56 and 68 miles per hour.  His best estimate was more than 60 miles per hour.

Theriault estimated that the T-T was from 221 to 328 feet from the intersection when the Lincoln car arrived at the stop bar in the left turn lane.  In his opinion if the T-T was driving at 40 miles per hour, as Arbucci stated, Saint's vehicle, which took between 2.7 and 4 seconds to turn, would have cleared the intersection and there would have been no accident.

In essence, the plaintiff's expert based his calculations of the speed of the T-T prior to and at impact on three factors (1) the final resting place of the T-T 372 feet from the point of impact, (2) the final resting place of the Lincoln car, approximately 250 feet from the point of impact, and (3) the extensive damage to the front of the Lincoln car caused by its impact with the side railing of the northbound lanes.  As to the latter factor, Theriault estimated that, after impact

9

with its right side, the Lincoln car traveled approximately 250 feet, slightly uphill, across a grass median divider, gouging the divider into and across the northbound lanes of Route 110 striking the guardrail at a speed of approximately 30 miles per hour; all the time while the Lincoln car was in gear. The photographs demonstrate the severe impact and extensive damage to the front of the Lincoln car caused by this second impact. (See the photographs in Appendix A annexed hereto). Theriault explained the reasons for his determinations as follows:

> Q       By the way, I would like to hand you Plaintiff's Exhibit 16 for identification.
>
>    What is that?
>
> A       These are handwritten notes and calculations I performed.
>
> Q       With respect to what?
>
> A       To the speed the post-impact speed of the Lincoln.
>
> Q       These are the calculations in Plaintiff's Exhibit 16 for identification that you used to calculate the speed of the tractor trailer based on the final resting position of the Lincoln?
>
> A       Correct.
>
> Q       Let's start with the Lincoln at its resting point.
>
>    How did you do your calculations regarding its impact speed?
>
> A       The impact speed is based on the amount of crush to the front of the vehicle. I determine it to be approximately 21 inches.

Now, that isn't the total amount of crush, because it's some damage that is what we call override damage from the guardrail. There's actually more crush in that, but we have to make the adjustment of half of that in order to get the 21 inches.

* * * * * *

Q        What did you do to calculate your speed?

A        Using the graph alone, and with 21 inches of crush with a larger car  gives me approximately between 25 and 30 miles an hour.

        THE COURT: That's for which vehicle?

        THE WITNESS: The Lincoln, the frontal impact to the guardrail.

Q        That's just the speed of the Lincoln when it's hitting the guardrail, correct?

A        Correct.

Q        By the way, how far did the Lincoln travel before it hit that guardrail?

A        Approximately 250 feet.

Q        So the Lincoln traveled 250 feet from the point of impact with the tractor trailer until it hit the guardrail at 30 miles an hour?

A        Correct.

* * * * * *

Q        By the way, is the vehicle traveling uphill or downhill?

A        It's traveling uphill and, again, we're dealing with a 3 percent positive grade.

**Q**	Does that affect the deceleration rate?

**A**	Sure does.

**Q**	What about whether or not the car was in gear, would you assume the car was in gear?

**A**	Yes.

**Q**	Does that affect the deceleration rate?

**A**	Yes, it does.

**Q**	Why is that?

**A**	Again, you have drag from the engine and transmission, from an engine that's not running anymore.

\* \* \* \* \* \*

**Q**	What about the undercarriage dragging on the ground, is that one?

**A**	Yes, it is.

**Q**	As reflected by the plowing through the grass and the scrapes on the road?

**A**	Correct.

\* \* \* \* \* \*

**Q**	Now, based on the deceleration factor that you just told us, the .42, and putting aside for a moment the guardrail impact, can you calculate a speed just based on the deceleration rate?

**A**	Yes.

**Q**	Or deceleration factor?

**A**	Yes.

Q	What is that?

A	That speed came out to be 55.9 miles an hour.

Q	That's the speed of what?

A	From impact to final rest, not including the impact to the guardrail.

If the Lincoln had come to a stop moments before striking the guardrail, that's what the speed of the Lincoln would have been, is 55.9 miles an hour.

THE COURT: Let me see if I understand what you just said.

The speed from the time of impact to the time the Lincoln came to rest is 55.9 miles per hour?

THE WITNESS: If it had not hit the guardrail. If it stopped an inch of the guardrail, that's what the speed of the Lincoln would have been post-impact speed.

Q	The immediate post-impact speed?

A	Correct.

Q	Right at the point of impact that would have been the speed, am I right?

A	Yes.

Q	Now, what happens when you add in the fact that the Lincoln did not stop just before the guardrail but, in fact, smashed into the guardrail at 30 miles an hour?

A	I combine the two speeds and it equates to a speed of 63.4 miles an hour.

Q	63.4?

A	Yes.

**Q**      If that was the speed of the Lincoln at the time of impact, then what's the speed of the tractor trailer at the time of impact?

**THE COURT: With what?**

**MR. FISHER: With the Lincoln.**

**A**      Because there's an energy exchange, the speed of the tractor trailer at the moment of impact is approximately 63.4 miles an hour.

\* \* \* \* \* \*

**Q**      What's the basis for your disagreement?

**A**      Generally with this type of damage I would normally see at highway speeds during my investigations of crashes, and the fact that the damage was caused to the Lincoln and then pushed the Lincoln 250 feet up the roadway, across the roadway, and into a guardrail, definitely suggests that this is a highway speed crash.

**Q**      When you say highway speed, you mean over 60 miles an hour?

**A**      Correct.

Tr. at 118, 119, 122, 125, 128, 129, 130, 131, 136.

So that, according to this expert there was an exchange of energy from the T-T to the Lincoln which caused the Lincoln to travel 250 feet and smash into the siderail on the opposite side of the road. The speed of the T-T at the time of impact was therefore calculated to be 63.4 miles per hour.

On cross-examination Theriault agreed that the plaintiff slowed down but did not come to a stop before making his left turn and that the speed of both drivers should have been reduced because of the rain. Theriault also conceded

14

that the left turning Lincoln driver had to yield the right of way to oncoming traffic and, if there was any doubt, the Lincoln should not turn into such oncoming traffic, and should "err on the side of caution." However, he also stated that the T-T driver also had the obligation to drive at a reasonable rate of speed, especially in rainy weather, and always to be aware that the T-T needs additional distance to stop – therefore to proceed at a slower speed.

The Court also takes note of the relevant provision of the New York State Commercial Driver's Manual in evidence (Plf. Ex. 18). These provisions include the subject matter "Matching Speed to the Road Surface" and include the following warnings:

> The effect of speed on stopping distance. Whenever you double your speed, it takes about four times as much distance to stop and your vehicle will have four times the destructive power if it crashes. High speeds increase stopping distances greatly. By slowing down a little, you can gain a lot in reduced braking distance.

> \*     \*     \*     \*

> Slippery Surfaces. It will take longer to stop and it will be harder to turn without skidding when the road is slippery. You must drive slower to be able to stop in the same distance as on a dry road. Wet roads can double stopping distance. Reduce speed by about one third (e.g., slow from 55 to about 35 mph) on a wet road.

Also, in the Federal Motor Carrier Safety Regulations Handbook, in evidence (Plf. Ex. 19), it is stated that "Extreme caution in the operation of a commercial motor vehicle shall be exercised when hazardous conditions such as those caused by . . . rain . . . adversely affect visibility or traction. Speed shall be

reduced when such conditions exist."

### (2)   The Defendant's Case on Liability

In the defendant's case, T-T operator Mark Abrucci testified that he drove a route from 3:15 a.m. to 11:45 a.m., six days a week. He drove a different T-T every day. There was a governor on his T-T set for 60 miles per hour and he couldn't drive faster than that speed. The T-T has regular foot brakes "just like a car." (Tr. at 230). The morning of the accident, he reported at 3:15 a.m., he received his load of mail, checked the brakes and traveled to Holbrook and then Medford where he unloaded mail and picked up empty containers. He was on his way back from the Huntington Station Post Office to the Mid Island Post Office and was southbound on Route 110 when the accident occurred. The trailer was empty. Abrucci testified that the accident occurred in the right-hand lane of Route 110 southbound in the north service road of the Long Island Expressway. He was familiar with these roads, having traversed this route for one and one-half years prior to June 7, 2002.

At the accident point, Route 110 south has two lanes and a right turning lane. It was approximately 6:20 a.m. It was raining fairly hard and visibility was poor. As he was proceeding in the right-hand lane, the light was green for southbound traffic on Route 110. He saw no traffic in the southbound lane. However, when he was approximately 150 feet from the intersection he did see traffic in the left turning lane of northbound Route 110. He saw the headlights

in the left turn lane "approximately two-thirds of the way up the ramp." At that time his T-T was going approximately 40 miles per hour. He knows that because he glanced at his speedometer "every now and again." (Tr. at 238). Arbucci described how the accident occurred as follows:

> Q       Tell me what happened when you were 150 feet from the intersection and you saw the vehicle in the left turning lane. What happened next?
>
> A       It started to rain really hard, it turned into a deluge of rain. I glanced up at the light and I looked down, I saw a car in front of me and had instant impact.
>
> Q       When you glanced up at the light, what color was it?
>
> A       It was green.
>
> Q       When you saw the car, where was it?
>
> A       Right in front of me.
>
> Q       Was – did you brake before you saw the car?
>
> A       I never had a chance.

Tr. at 238.

Actually, according to Arbucci, the T-T hit the car a second time and spun it around to the left. His T-T stopped on the "cloverleaf" of the westbound lane of Route 110 and the Long Island Expressway. Arbucci had pain in his lower back and was taken by ambulance to North Shore Hospital where he remained for a few hours. He signed two statements for the Suffolk County Police, attesting to the facts as stated above.

17

On cross-examination Arbucci testified when he first saw the green light, he was 500 feet from the intersection and it took him five or six seconds to get to the intersection. He was driving slower than usual because of the weather conditions. As he approached the intersection, he took his foot off the accelerator because he was taught to do that and he had an obligation not to be speeding as he approached an intersection such as this.

John Widecki testified that he witnessed this accident on June 7, 2002 at the intersection of Route 110 and the westbound service road of the Long Island Expressway. He worked for Apex Laboratories located one block away from the accident site. He was stopped in the right-hand lane of the westbound service road of the Long Island Expressway waiting for the light to turn green. He saw a Lincoln car approaching westbound on Route 110 in the left lane, go into the left turning lane at about 30 miles per hour. At some point he saw a T-T approaching in the southbound lane of Route 110 traveling at "I would say about 35, 40 miles an hour." (Tr. at 269). Strangely, he testified that the Lincoln car went through a red light. He saw the Lincoln slow down "a little bit to around 25, 30" (Tr. at 269), make the left turn and proceed into the intersection and the two vehicles collided. When the Lincoln pulled into the intersection, the T-T was about 60 to 70 feet from the intersection. The T-T did not brake or slow down and hit the Lincoln at "about 35, 40." (Tr. at 269).

Widecki was the first person at the scene to try to assist the Lincoln driver.

At the scene, he gave a written statement to the police, and another statement later that same day. In the statement, he reiterated his view of the occurrence, as stated above and also stated:

> The black Lincoln was pushed south on 110 across the divider and also across the three northbound lanes of traffic. (Tr. at 275).

> When Widecki got to the Lincoln car he described what he saw:

> When I got to the car the driver was semi-conscious, had labored breathing and his body was positioned with his right arm pinned between the driver's seat and driver's side door and he was laying on his right side across the front seat. The ambulance showed up and they took driver. . ..

Tr. at 275.

Dr. Anthony Storace is an accident reconstruction expert who was retained by the Government. He stated that, after the initial impact, the Lincoln car rotated and mounted the grassy divider, and entered the northbound lanes, coming to rest against the east guardrail on the northbound side approximately 250 feet from the point of impact. Following the collision, the T-T moved to the right and south approximately 372 feet. He stated that the witness to the occurrence testified that the speed of the Lincoln as it approached the turn was 30 miles per hour and slowed to 20 to 25 miles per hour at the turn. He agrees with that assessment. In his opinion, the Lincoln car took only two seconds to get to the collision site and the T-T driver could do nothing to avoid the accident.

The Government asserts that the T-T had a governor limiting it to the

speed of 60 miles per hour and that it did not have engine-breaking because it had no retarder.  The Court finds that there is no evidence of the existence of a governor in the T-T at the time of this occurrence.  Dr. Storace's report contains no mention of a governor or a retarder, even though, obviously, the speed of the T-T was a crucial issue in this case.

In Dr. Storace's opinion, the speed of the T-T prior to the impact was "about 40 miles per hour." (Tr. at 310).  He came to that conclusion, surprisingly, by the "crush" impact to the Lincoln car after it came in contact with the guardrail, and principally because there was little damage to the guardrail.  Also, he made this determination because of the side impact during the collision.  The Court has some concern about this method of determining the speed of the vehicles.  Viewing the tremendous impact damage to the front of the Lincoln car when it struck the guardrail, common sense and logic leads to the conclusion that, 250 feet after the actual impact that Lincoln car was driven into the guardrail at a relatively high speed.

Dr. Storace testified that the T-T traveled <u>only</u> 372 feet because it was braking.  One would wonder how far it would have traveled if it was not braking.  The third reason for his opinion as to the speed of the T-T was based on the testimony of the truck driver.  Dr. Storace concluded his testimony on direct examination with his final conclusions:

Q        Have you come to a conclusion as to what caused this

collision?

A       Yes.

Q       Can you tell us?

A       The only cause that I can find is the driver of the Lincoln made an illegal left turn into the southbound lane in front of oncoming traffic, and the collision was the inevitable result of that.

         The driver had no possibility of reacting to do anything to stop the collision.

Q       Do you have a conclusion as to whether the tractor trailer's speed was appropriate under the circumstances?

A       Yeah.  We're both in agreement on that.

         40 miles per hour would have been the correct speed to be traveling under rainy conditions on a road with 55 miles per hour speed limit.

Tr. at 323-324.

         On cross-examination, Dr. Storace conceded that the traffic light sequence

played no role in this occurrence in that both drivers had green lights.

Q       Do you agree that the testimony of Mr. Widecki, the witness that said Mr. Saint turned through a red light, was wrong?

A       Yes.

Q       You testified here today that both Mr. Saint and the truck driver had green lights, right?

A       Yes.

Q       In fact, you didn't mention anything in your report about the light sequencing because you thought the light sequencing played no role in this case, true?

        A       Yes.

Tr. at 333.

In the Court's view, a key turning point in the testimony of Dr. Storace was the distance the T-T driver was from the intersection when he first saw the green light and the time it took him to get to the intersection, as follows:

        Q       Do you recall that Mr. Arbucci testified that he was 500 feet away from the intersection when he first saw the green light, and that it took him five to six seconds to get to the intersection; do you recall that?

        A       Yes.

        Q       Well, if we do the math, based on that testimony, Mr. Arbucci is, himself, saying he's doing in excess of 60 miles per hour, right?

        A       No.

        Q       Sir, 500 feet is about a tenth of a mile, true?

        A       About.

        Q       Doesn't six seconds, to travel 500 feet, correlate to about 60 miles per hour?

        A       I can't answer that. I can do the calculation for you and tell you what the speed is.

        Q       Do the calculation.

        A       56 miles per hour.

        Q       What if it took him five seconds to go 500 feet?

        A       68.

* * * *

**Q**      **Doctor, according to your calculations, if Mr. Arbucci testified that it took him five to six seconds to travel 500 feet, you just told us that by his testimony he's going between 56 and 68 miles per hour, true?**

**A**      **Yes, sir.**

**Tr. at 335-336.**

    **(B)**      <u>**Findings on Liability**</u>

    **Initially, the Court notes that Thomas Saint, the twenty year old driver of the Lincoln car and the _defacto_ injured plaintiff suffered a severe brain injury in this accident, with residuals including a loss of memory about the facts of the accident. In reviewing the medical records of the Head Injury Rehabilitation Unit at St. Johnland, the following data was revealed concerning the memory of Thomas Saint following the accident:**

    **On a neurobehavioral evaluation performed on 9/16/02, the patient achieved a score of 53 on the Galveston Orientation and Amnesia Test (GOAT), reflecting impaired orientation and memory for the time around the accident. Based on his GOAT score, he remains in post-traumatic amnesia (PTA).**

* * * *

    **On 9/23/02 the patient achieved a score of 64 on the GOAT (impaired, but improved). His visual-spatial abilities were in the severe impairment range. He displayed mild adjustment related dysphoria. On 10/8/02 he scored a 71 on the GOAT (Borderline range of impairment). He was oriented to name, age, city, facility, month, year, time of day, and to day of the week. He continues to be unable to describe events before and after his motor vehicle accident.**

As a result of the loss of memory by the only eyewitness on behalf of Thomas Saint, the plaintiff is entitled to the benefit of a charge applying the rule of *Noseworthy v. New York*, 298 N.Y. 76, 80 N.E.2d 744 (1948). As stated in the New York Pattern Jury Instructions, PJI 1:62, the *Noseworthy* rule is applicable if the plaintiff has established by clear and convincing evidence that Thomas Saint suffers from amnesia caused by the accident. *See Schechter v. Klanfer*, 28 N.Y.2d 228, 269 N.E.2d 812, 321 N.Y.S.2d 99 (1971); *Nahvi v. Urban*, 259 A.D.2d 740, 687 N.Y.S.2d 398 (2d Dep't1999); *Stanford v. Resler*, 206 A.D.2d 468, 615 N.Y.S.2d 46 (2d Dep't1994).

The burden of proof remains on the amnesiac plaintiff to present *prima facie* evidence of the defendant's negligence before the *Noseworthy* rule can be applied. The rule permits latitude in drawing an inference of negligence but does not shift the burden of proof. *See Peterson v. P. Ballantine & Sons*, 205 N.Y. 29, 98 N.E. 202 (1917); *Lynn v. Lynn*, 216 A.D.2d, 194, 628 N.Y.S.2d 667 (1st Dep't 1993).

After reviewing the evidence and the transcripts of this trial, the Court finds that the accident and the injuries to Thomas Saint were substantially caused by his own negligence in making a left turn across traffic, in violation of the New York Vehicle & Traffic law and in failing to exercise reasonable care in the operation of his motor vehicle. However, Saint was the major cause but not the sole cause of this occurrence. The speed of the T-T, between 56 and 68 miles per hour, especially in view of the rainy weather conditions, described by Arbucci as

a "deluge," constituted a contributing cause.

The Court credits the testimony of the plaintiff's expert that the T-T was proceeding at a speed of between 56 and 68 miles per hour in a heavy rain, as it approached the intersection prior to the impact. Significantly, this opinion is corroborated, in part, by the defendant's expert, as stated above. The excess speed of the T-T was also demonstrated by the severity of the impact; the distance the Lincoln car was thrown by the force of the impact with the T-T; and the distance the T-T itself traveled after the impact. As stated in *Patti v. Fenimore*, 181 A.D.2d 869, 581 N.Y.S.2d 432, 433, 434 (2d Dep't 1992):

> The jury could properly infer from the location of the damage to the two cars and from the fact that the plaintiffs' car hit the defendants' "big Cadillac" with such force that the defendants' car spun around, that the plaintiffs' car was traveling a good deal faster than Lynn Patti claimed.

With regard to John Widecki, the eyewitness, his testimony is considerably shaken by his insistence that he saw Saint's vehicle go through a red light when he made his turn. This important fact is refuted by the T-T driver and the defendant's expert who both state that the Lincoln car, as well at the T-T, had the green light when the turn occurred.

In sum, operating a large, heavy T-T in the rain, with diminished visibility, approaching an intersection with a major highway, at a speed of between 56 and 68 miles per hour, in excess of the 55 miles per hour speed limit, constituted a failure to exercise reasonable care. In addition, the Court finds that there is

evidence that the collision would not have occurred if Arbucci had been driving at or below the speed limit.  Thus, the Court finds that the T-T operator was negligent, which was <u>a</u> proximate cause of the accident.

Accordingly, the Court finds that the negligence of both drivers, Thomas Saint and Mark Arbucci, contributed to the happening of this accident, although not equal in degree.

(C)     <u>Apportionment</u>

The Court having found that <u>**both**</u> the Lincoln driver Thomas Saint and the T-T driver Mark Arbucci were negligent which combined to cause this occurrence, the Court will now determine the question of apportionment.

In apportioning the Court must weigh the relative degree of fault as between the two drivers, and determine as between those persons what part of the total fault shall be apportioned to each by way of a percentage of fault for each. In making that determination, the Court will consider the duties owed by each of these parties and the question of whether the conduct of that party deviated from the duty that he owed, and weigh the relative degree of fault of each, expressed as a percentage of the total fault of both drivers.

Weighing all the facts and circumstances, the Court must consider the total negligence, that is, the negligence of <u>**both**</u> drivers which contributed to causing this occurrence and determine what percentage of negligence is chargeable to each.  In the effort to determine the percentage of responsibility, with regard to

this left-turning motor vehicle operator, a review of the precedents is instructive.

In *Teller v. Anzano*, 263 A.D.2d 647, 694 N.Y.S.2d 780 (3d Dep't 1999), the defendant made a left turn and was struck in the rear right side by the plaintiff's motorcycle. The plaintiff contended that he had been driving his motorcycle behind a truck and was accelerating and changing lanes and did not see the defendant's turning automobile until seconds before impact. The jury found the defendant left-turning motorist to be 30 percent at fault and the plaintiff straight away motorcycle to be 70 percent at fault. The Appellate Division held that the jury's apportionment of 30 percent to the turning defendant driver and 70 percent to the straightaway plaintiff motorcycle was reasonable.

> With respect to plaintiff's culpability, we similarly view the record as supporting the jury's allocation of 70% of fault to plaintiff. Although plaintiff claims that he had the right of way (*see* Vehicle and Traffic Law § 1141), he clearly had a duty to exercise reasonable care in changing lanes and entering the intersection (*cf.*, *Patti v. Fenimore*, *supra*, at 871, 581 N.Y.S.2d 432; *Walker v. Dartmouth Plan Leasing Corp.*, 180 A.D.2d 952, 580 N.Y.S.2d 535; *Rice v. Massalone, supra*, at 863, 554 N.Y.S.2d 294, *Ward v. Watson, supra*, at 915-916, 536 N.Y.S.2d 899), including the requirement of reducing his speed to an appropriate rate (*see*, Vehicle and Traffic Law § 1180[e]). . . . Upon the proof presented at trial, we conclude that plaintiff has failed to demonstrate that the apportionment of fault, which was within the province of the jury, could not have been reached by any fair interpretation of the evidence, even though the record may also support a different version (*see, Coutrier v. Haraden Motorcar Corp.*, 237 A.D.2d 774, 775, 655 N.Y.S.2d 660; *Krueger v. Wilde,* 204 A.D.2d 988, 989, 614 N.Y.S.2d 88; *Esner v. Janisziewski,* 180 A.D.2d 991, 993, 580 N.Y.S.2d 551; *Vail v. Keeler*, 166, A.D.2d 817, 819, 562 N.Y.S.2d 818).

In *Lang v. Bouju*, 245 A.D.2d 1000, 667 N.Y.S.2d 440 (3d Dep't 1997), the

defendant was making a left turn into a parking lot and drove across a double yellow line into the lane of oncoming traffic, where the plaintiff's decedent, driving a motorcycle, approached in the oncoming lane. The defendant stopped and the motorcycle slid into the front bumper of the defendant truck. The jurors returned a verdict finding the defendant left-turning driver 72 percent liable for the collision and the plaintiff motorcycle driver 28 percent liable. This apportionment was affirmed by the Appellate Division.

*Dixon v. Knickerbocker Drivurself, Inc.*, 72 Misc.2d 1025, 341 N.Y.S.2d 150 (City Ct, Albany Co. 1973), was a bench trial. The plaintiff was in the process of making a left turn and stopped for pedestrians and was struck by the defendant straightaway driver. The Court held that the defendant "was negligent in the operation of the defendant's vehicle in operating it too fast or in failing to keep a proper lookout or to slow or stop his vehicle to avoid collision with plaintiff's vehicle in front of him . . . ." The Court determined that the plaintiff, the turning driver, was 30 percent responsible for the occurrence, and the defendant straightaway driver was 70 percent responsible.

One rather remarkable case involving a left-turning vehicle was *Breisch v. City of New York*, No. 86 CIV 2485, 1987 WL 9443 (S.D.N.Y. Apr. 6,1987). In Manhattan, the two vehicles were proceeding in opposite directions on 12th Avenue at the intersection of 30th Street. Livigni was proceeding north and Spinelli was proceeding south and was making a left-hand turn across the path

fo the Livigni vehicle. Two passengers in the Spinelli car were killed when the Livigni truck struck Spinelli's car on the passenger side. The jury found that the Livigni truck was speeding at the time of the accident and that his speeding was a proximate cause of the accident. The jury apportioned 52 percent of the cause of the accident to Livigni, the straightaway driver, and 48 percent to Spinelli, the left-turning driver.

The district judge denied a Rule 50 motion by Livigni for judgment notwithstanding the verdict (now designated as a motion for judgment as a matter of law). In so ruling, the Court found that Livigni was exceeding the 30 mile per hour speed limit. (Experts testified that the Livigni vehicle was going between 50 and 55 miles per hour). Also, the Court held there was evidence adduced for the jury that Livigni's speeding was a proximate cause of the collision in that it would not have occurred had he been driving at the speed limit. As to the unusual apportionment, the Court ruled as follows:

> Similarly, the jury's apportionment of 52% of the cause of the crash to Livigni [the straightaway driver] is not clearly erroneous. On evidence tending to prove that Spinelli should have seen the truck approaching and yielded the right of way, the jury concluded that Spinelli was negligent and that his negligence proximately caused the accident. Nevertheless, the jury could also have concluded that had Livigni been watching the road and traveling the speed limit, he could have avoided the accident. Once the danger was created, albeit by Spinelli, Livigni would have had a good chance to avoid it had he not been speeding. A green light did not give him the absolute right of way; he was still obliged to enter the intersection with care. The apportionment of 52% of the cause of the accident to Livigni and 48% to Spinelli is the jury's judgment call, and should not be overturned by the court.

Another such case was *Stinehour v. Kortright*, 157 A.D.2d 899, 550 N.Y.S.2d 269 (3d Dep't 1990). In *Stinehour*, the plaintiff motorist was injured while attempting to execute a left turn and was struck by a truck which entered the intersection on a yellow light. On a motion by the plaintiff left-turning vehicle for summary judgment, the Court held that the straightaway truck was solely liable, as a matter of law. As in this case, the plaintiff and defendant were traveling on the same road and were approaching an intersection, when the plaintiff initiated a left turn. The defendant truck drove directly into the path of the plaintiff's turning vehicle. The Court held that the defendant straightaway truck was the sole cause of the collision by entering the intersection when the green light turned to yellow and in failing to see the plaintiff's vehicle until his car was "underneath" the truck.

The Appellate Division held that "In our view, this evidence established defendant's negligence as a matter of law," citing to Vehicle and Traffic Law § 1141. *See also Maloney v. Niewender & Beige*, 27 A.D.3d 426, 812 N.Y.S.2d 585 (2d Dep't 2006) (where there was no evidence that the straightaway vehicle was speeding, there was no liability); *Cox v. Nunez*, 23 A.D.3d 427, 805 N.Y.S.2d 604 (2d Dep't 2005) ("A driver with the right-of-way has a duty to use reasonable care to avoid a collision"); *Wallace v. Kuhn*, 23 A.D.3d 1042, 804 N.Y.S.2d 187, 188 (4th Dep't 2005) (where the straightaway driver may have exceeded the speed limit of 30 miles per hour by 5 miles per hour in apparent dry and clear weather, there

was no liability); *Galvin v. Zacholi*, 302 A.D.2d 965, 755 N.Y.S.2d 175, 177 (4th

Dep't 2003); *app. and rearg. den.*, 305 A.D.2d 1127, 758 N.Y.S.2d 25, (4th Dep't

2003), *lv. to app. den.* 100 N.Y.2d 512, 799 N.E.2d 6616, 767 N.Y.S.2d 393 (2003)

(In dry, sunny and clear weather, when straightaway vehicle was traveling four

miles per hour over the speed limit, and no evidence that she could have avoided

the collision had she traveled at the speed limit, there is no liability); *Peschieri v.

Estate of Ballweber*, 285 A.D.2d 921, 727 N.Y.S.2d 811, 813 (3d Dep't 2001) (there

is no liability when the straightaway vehicle is traveling within the speed limit);

*Vogel v. Gilbo*, 276 A.D.2d 977, 715 N.Y.S.2d 455 (3d Dep't 2000) (Driver of

straightaway vehicle was not liable where there was no evidence that he exceeded

the speed limit); *Mazur v. Dillon*, 3 A.D.2d 789, 160 N.Y.S.2d 207 (3d Dep't 1957)

(plaintiff left-turning driver prevailed in that the plaintiff was not bound to

anticipate that the defendant straightaway driver would proceed at an excessive

speed).

In *Cooley v. Urban*, 1 A.D.3d 900, 767 N.Y.S.2d 546 (4th Dep't 2003),

summary judgment in favor of the straightaway driver was denied, with language

particularly applicable to this case:

> It is well established that there can be more than one proximate
> cause of an accident. Here, the fact that Cooley made a left-hand
> turn in front of Urban's vehicle is not dispositive of the issue
> whether Urban failed to exercise reasonable care in proceeding
> toward the area where the accident occurred without slowing,
> despite seeing the Cooley vehicle exit its lane of travel and traverse
> the entire median before turning into Urban's lane of traffic (*see
> Deshaies v. Prudential Rochester Realty*, 302 A.D.2d 999, 1000, 755

N.Y.S.2d 155; *Wooley v. Coppola*, 179 A.D.2d 991, 992, 578 N.Y.S.2d 729).

Also, in *Greco v. Boyce*, 262 A.D.2d 734, 691 N.Y.S.2d 599, 600 (3d Dep't 1999), similar language as to the straightaway driver is helpful.

> Although from the foregoing testimony it is easy to conclude that plaintiff was negligent by attempting to turn left without yielding to defendant (*see,* Vehicle and Traffic Law § 1141), there still exists a fact issue as to defendant's comparative fault, for one cannot blindly and wantonly enter an intersection (*see,* Vehicle and Traffic Law § 1180[e]).  Given plaintiff's testimony suggesting that as defendant approached the intersection she failed to keep a proper lookout and to see that which was there to be seen, and the further fact that defendant may have been traveling too fast for the circumstances she confronted and in so doing contributed the accident's cause, it cannot be adjudged as a matter of law that plaintiff's "conduct was the sole precipitating cause of the accident" (*Premo v. Lam,* 222 A.D.2d 872, 873, 635 N.Y.S.2d 319; *see, Walker v. Dartmouth Plan Leasing Corp.,* 180 A.D.2d 952, 953, 580 N.Y.S.2d 535).

*See also Soto v. New York City Transit Authority,* 6 N.Y.3d 487, 846 N.E.2d 1211, 813 N.Y.S.2d 701, 704 (2006) ("Plaintiff's conduct was undeniably reckless, but the jury appropriately considered plaintiff's actions and determined that he bore a far greater share of the fault.  This is in keeping with the doctrine of comparative negligence")*; Behr v. Graham,* 292 A.D.2d 788, 740 N.Y.S.2d 179, 180 (4th Dep't 2002) (summary judgment denied to straightaway driver going 35 miles per hour on a wet roadway); *Premo v. Lam*, 222 A.D.2d 872, 635 N.Y.S.2d 319, 320 (3d Dep't 1995) ("Finally there remains unresolved the issue of the proportion of negligence, if any, attributed to each defendant.").

After reviewing the facts and the law, the Court apportions the liability of

the two drivers as follows:

| | |
|---|---|
| **Percentage of total fault apportioned to driver Mark Arbucci** | **15** % |
| **Percentage of total fault apportioned to driver Thomas Saint** | **85** % |

**D)**      <u>**Injuries and Damages**</u>

In this occurrence on June 7, 2002, the Lincoln driver Thomas Saint sustained a severe closed head brain injury, multiple lacerations and a fracture of the right clavicle. He was taken to the Nassau County Medical Center where he remained until July 2, 2002. The discharge summary reveals that he was diagnosed with a traumatic brain injury with cerebral edema, loss of consciousness and seizures. His hospital course was complicated by tachycardia, pneumonia and UTI. He had a tracheotomy and was on a ventilator to June 25, 2002.

**(1)**      <u>**The Plaintiff's Case**</u>

Eve Saint is the mother of Thomas Saint who was born on May 18, 1982, was 20 years old at the time of the accident, and is presently 24 years of age. Thomas' father died three months after this accident. Thomas was an apprentice stationary engineer working for Local 30 in the plumbing, air conditioning and refrigeration maintenance field. At the time of the accident he was working at the Fleet Bank and other places. He never missed a day from work; he worked overtime; and he contributed to the expenses of the household. Mrs. Saint

testified that Thomas contributed between $200 and $700 per week to the expenses of the household.

June 7, 2002 was a rainy, windy day.  In fact, the weather was so severe that a tree fell down in her backyard and took out the electric power.  When she was told about the accident, she drove to the Nassau County Medical Center.  Thomas was in a coma and remained in that state until Dr. Wing Ng woke him up in July 2002, about a month later.  She left her job and never left his bedside during this period.  Thomas was transferred to Southside Hospital where he came under the care of Dr. Ng and was still in a coma for a few weeks.  When he came out of the coma, he could not move his hands and legs and could only blink his eyes.  On September 13, 2002, Thomas was moved to St. Johnland Trauma Unit and he came home for Christmas 2002.

Mrs. Saint testified that, as of 2004, the medical bills (Plf. Ex. 13) totaled approximately $550,000, and there were a lot more bills incurred after that period.   Thomas has been treated by a number of specialists including neurologists, a neuro-ophthalmologist, a speech therapist and has undergone physical therapy.  After he came home at Christmastime 2002, she and his brothers, and her neighbors and friends have been taking care of Thomas on shifts.

Mrs. Saint described the progress Thomas made in four years.  He walks better but still falls down.  His speech is better at times.  He doesn't sleep at night

and wets his bed.  He is angry, hostile and violent.  On one occasion he tried to choke his brother Christopher and, in the process, damaged the kitchen and living room.  She has trouble obtaining a caretaker for Thomas because he is so violent.  She cannot leave him alone – it is not safe.  Part of his anger is his realization of his restricted life – he would want to work and have a girlfriend, like any other 24 year old.

On a subject of some importance to the Court, Mrs. Saint testified that Thomas could not come to court because he would not have liked what she said and would be angry and agitated in court, and "the guards would have had to sit there and jump on him to control him."  (Tr. at 34).  It is unfortunate that Thomas Saint did not appear in court at all, not once during the four trial days, as the Court will discuss later in this decision.

As of the present time, Thomas is on heavy medication, 21 pills a day.  According to his mother, he spends the day "pretty much sleeping and doing nothing." (Tr. at 34).  He has trouble with his left hand.  He watches video games and reads car magazines and spends time on the phone talking to her at work and to friends.  He can't drive a car nor does he dress himself properly.  Apparently, he still has a suicide ideation.

Mrs. Saint was questioned on the important question of the ability of Thomas Saint to be employed:

Q       Eve, is there any job, in your view, that Tommy could hold outside of the household?

**A**      **I don't think so, I really don't, unless you want to stick him in a store, yes, where all he has to say is hello or have a nice day.**

**There's nothing that Tommy could do because his attention span is not there anymore. He has no mobility in his hands. They don't work right.**

**And sometimes he can't even control his bowel movements. I would prefer if he wore diapers. He doesn't want to wear diapers. Sometimes he doesn't know if he wet himself or not.**

**He can't go out in the world and function like that. He can't have a job because nobody is going to keep him there.**

Tr. at 39-40.

On cross-examination, Mrs. Saint testified that Thomas doesn't remember what happened in the accident. Also, she stated that he was estranged from his father, who had substance abuse problems and who was no longer living at the marital residence. Thomas receives social security disability benefits at approximately $1,000 per month. Also, Thomas had broken off with his girlfriend prior to the accident. In addition, Mrs. Saint testified that she never paid anyone to watch Thomas.

Thomas Saint was transferred to Southside Hospital on July 2, 2002 and discharged on September 13, 2002. It was at this hospital that he came under the care of Dr. Wing Ng, a brain injury rehabilitation specialist. The discharge summary of Southside Hospital signed by Dr. Ng reveals that during Saint's stay at the hospital he made slow but steady progress but remained unresponsive. A CT scan showed a right frontal subdural hematoma. Early in his admission,

Saint had persistent tachycardia and had to be given beta blockers. Toward the end of his stay, his heart rate was within a normal range without medication. No intervention was needed for his right clavicle fracture. On August 21, 2002, while the patient was getting x-rayed, he fell off the stretcher and had a laceration on his right forehead which was sutured. When a left acute subdural hematoma was discovered, he was transferred to the ICU and his stay there was uneventful.

His progress continued at the Southside Hospital. The trach, the Foley and the PEG were all removed by the middle of August. He was able to communicate his needs; remembered the staff members' names and his family and prior social life (like his girlfriend and going to school); was able to move all extremities and participate in therapy. As stated in the final discharge by Dr. Ng, "He made significant progress during his hospital stay with us at Southside Hospital." His subdural hematoma was now stable and resolving. The patient also intermittently complained of aches and pains all over his body, more because of soreness while working out and bilateral chest pain. He did well with Tylenol for the pain.

Saint was cleared for discharge on September 13, 2002 "for subacute care." With minimal assistance, Mr. Saint was able to sit, stand and pivot and use rolling walker. He did have decreased recall, problem solving, orientation and inhibition. "In community skills the patient still requires 24 hour supervision at this time." He was discharged in a stable condition, with subacute care followup and multiple discharge medications and with instructions to continue with

occupational therapy, physical therapy and speech therapy.  The final diagnosis in the Southside Hospital record was "traumatic brain injury secondary to motor vehicle accident."

In a report dated September 16, 2002 (Plf. Ex. 6), three days after his discharge from Southside Hospital, Dr. Ng stated the following:

> As a result of the accident, Thomas suffered a severe traumatic brain injury and a right clavicle fracture and was left in a comatose state until approximately June 28, 2002.  Since that time, Thomas has made slow, steady neurologic recovery, but he remains severely limited in both physical and cognitive abilities as a result of the traumatic brain injury.
>
> Thomas remained in a minimally-conscious state for the initial month of his brain injury rehabilitation.  He developed severe spasticity (increase in muscle tone) which had resulted in contractures of his arms and legs.  This has improved with physical therapy intervention.  As he became more responsive and interactive, he was able to work on functional skills.  Nevertheless, even after over two months of rehabilitation, he is still very impaired.  He is currently unable to get up from bed, stand, or walk by himself, requiring the assistance of trained therapists to perform these tasks and to keep himself balanced.  He is dependent on a wheelchair when out of bed.  He is unable to perform toileting, hygiene and dressing tasks.  He remains incontinent of both bowels and bladder.  While he has begun to feed himself, he still requires assistance and set up of his meal.  He still requires modified consistency foods to prevent aspiration.  Cognitively, he is unable to recall day-to-day events consistently.  He is not consistently oriented to place and time.  While he is able to communicate his wants and needs, he often would not remember if and when his needs were met.  He has very severely impaired short-term memory, reasoning and judgement skills.
>
> Mr. Saint's current prognosis for future recovery is guarded, given the severity of his brain injury.
>
> It is my opinion that Thomas will never fully recover his physical

and cognitive abilities. Because of these persistent physical and cognitive deficits, he will not be able to return to productive employment.

Mr. Saint will require further medical care and rehabilitation of the next year. This would include another six months of focused inpatient/residential-type rehabilitation, followed by outpatient rehabilitation. He will need follow up with physicians and rehabilitation specialists, as well as a neuropsychologist to monitor his cognitive recovery. He will need assistance equipment such as a wheelchair, walker and bathroom equipment when he eventually returns home. His home may need modification for wheelchair accessibility.

A report from The Head Injury Rehabilitation Unit at St. Johnland was made, dated October 23, 2002, of the patient's evaluation with regard to cognitive, emotional and behavioral functioning. His initial evaluation reflected impaired orientation and post-traumatic amnesia. Emotionally he reported a suicide ideation and tried to kill himself by holding his breath and was sent to Stony Brook Hospital for an emergency psychiatric evaluation. He was judged not to be a threat to himself and thereafter adamantly denied suicide ideation.

By October 8, 2002, he improved mentally and was oriented as to name, age, city, facility, year, month and time of day and day of the week. His prior medical history was unremarkable. After high school, Mr. Saint took a five-year apprentice program for engineering. He was last employed as an apprentice engineer. He is single and has no children. He broke up with his girlfriend one week before the accident. It was also reported that Saint was alert, appropriately dressed, well-oriented and his receptive and language skills were functional. As

to memory, he was in the mild impairment range and was mildly impaired as to mental calculations. He reported that, at times, he feels unhappiness and anger related to his motor vehicle accident. However, he also tries to remain optimistic and to keep a positive attitude. He reported adequate sleep and appetite but was often disruptive with his daily requests and concerns. His behavior during the evaluation was appropriate.

Dr. Wing Ng testified by video deposition from Raleigh, North Carolina. He is a rehabilitation specialist for stroke and brain injuries. Dr. Ng first treated Thomas Saint in July 2002 at Southside Hospital. He had a Glascow Coma score 3, which was the lowest score. He was in a near comatose state and was unresponsive and seizing. Saint was a patient at Southside Hospital for two months and made a slow but steady recovery. After four weeks he made significant progress but still required 24 hour supervision and depended on a caretaker for all daily living.

On September 16, 2002, Saint was transferred to St. Johnland facility of subacute rehabilitation. Dr. Ng visited him on one occasion and it was encouraging to see some improvement. Dr. Ng transferred to St. Charles Rehabilitation facility and, on March 11, 2005, he again saw Saint. At that time he was still demonstrating brain injury and persistent headaches and double vision – apparently the medication was not helping. Saint also had an easily agitated angry temperament. He also had some cranial nerve palsy, which caused

double vision.

As to prognosis, Dr. Ng testified that most of Saint's recovery would be over the first year after the injury. After that, recovery would be slower and may not be noticeable. His progress for recovery is poor. In Dr. Ng's opinion, Saint will never return to productive employ. However, he does not require 24 hour supervision, but needs supervision on an intermittent basis.

On cross-examination, Dr. Ng conceded that at the St. Johnland Rehabilitation Center, the record revealed that Thomas Saint was alert and had only a mild memory impairment with improvement; that his visual and motor skills were normal; he had mild impairment in mental calculations; his reasoning was normal; and overall he showed significant improvement. In addition, his mother said that he was doing better at St. Johnland. Also, at St. Johnland, Dr. Ng only saw Thomas one time for ten minutes, to socialize, and he never saw him after the one visit in March 2005. He did examine Thomas at the March 11, 2005 visit at the St. Charles Rehabilitation facility. At that time he determined that his physical strength was quite good; he was very talkative; he exercised; he was able to walk, slower than normal with a little limp; and he had conflicts with family members. Dr. Ng also agreed with the assessment made by the defendant's examining physician, Dr. Arthur Rosen, that Thomas "has made a remarkable recovery." Dr. Ng concluded his testimony by stating that he doesn't "think that he has the capability of any kind of gainful employment. Nobody would be able

to hire him."

Dr. Jacqueline M. S. Winterkorn, an ophthalmologist, submitted a report dated February 23, 2004 (Dft. Ex. 7). She examined Thomas Saint for a number of visual symptoms, including an inability to "focus," occasional double vision, hallucinations, and headaches. The Court finds that the visual acuity findings were difficult to comprehend - and there was no explanatory testimony. In addition, the diagnoses were not otherwise explained. However, the diagnosis was post-traumatic paralytic strabismus in up gaze and left gaze; a left IIIrd nerve paresis; and a partial left VI nerve paresis. Nor were these diagnoses explained. There were no significant visual cognitive deficits as a basis for the patient's complaints, but rather a mechanical blurring from the images of the two eyes not fusing. Dr. Winterkorn reviewed with the patient how to minimize his problems. Saint was advised to return in two months. There is no indication in the record that he did return.

Kenneth J. Williamson is the Chief Engineer of a building in Hicksville. He oversees the maintenance of air conditioning and heating equipment in the building. He is also a member of Local 30, Stationary Engineers. In 2000, Thomas Saint worked for him as an apprentice at Fleet Bank at the corner of Route 110 and the Long Island Expressway. Thomas was one of his better apprentices and was a real "go-getter." Of his 20 to 25 apprentices, every one went on to become an engineer.

In a letter from the Business Manager of Local 30 (Plf. Ex. 11) the following information was stated. Thomas was employed with Fleet Bank as an apprentice engineer from January 29, 2001 to June 7, 2002; at the time of the accident he was earning $13.29 per hour and an additional $3.75 per hour paid into his pension and annuity funds, as well as medical and dental benefits; and Thomas was a "standout among the apprentices for his abilities within our field and was looking forward to a bright future as a fully licensed engineer within our field, until his accident." The letter also contained information as to the possible future earnings of Thomas, as follows:

1.   Licensed engineers at Fleet Bank covered under the current contract earn $30.00 per hour based upon a 40-hour work week, payable for the entire 52-week period as vacation is paid;

2.   The employer contributes 10% of the employee's hourly rate to the Annuity plan ($3.00 hr) and approximately ($2.00 hr) to the member's pension plan.

3.   Each employee can count on approximately 20-25% of their total work time in overtime. Overtime is paid at a rate of 1.5 of the hourly rate or $45.00/hour under the current contract;

4.   Also be advised our union has attained increases averaging 3.5% per annum on successive contracts since our original contract with Fleet Bank back in 1990.

I would also like to make you aware that Thomas, because of his demonstrated proficiency in our field, would certainly have been in the upper echelon of members in our organization. Approximately 35% of the members in this highly skilled field, as members of our union, earn over $100,000 per year. Mr. Saint certainly had the skill, personality and wherewithal to attain the level of proficiency

necessary to reach such earning levels.

**Plf. Ex. 11**

In addition, a letter from Local 30 Benefit funds, dated July 28, 2003 (Plf. Ex. 12), stated that Thomas was working more than 200 hours a month in five of the first six months of 2002.  The letter set forth the pension and annuity benefits payable to engineers in Local 30.  Also, the collective bargaining agreement between Local 30 and the company that operated the Fleet Bank facility was introduced in evidence (Plf. Ex. 10).  As of January 1, 2003, it provided for wages of an apprentice at $13.42 per hour and for an engineer at $29.01 per hour.  As of January 1, 2005, these wages increased to $13.90 and $29.60 respectively.

Mr. Williamson visited Thomas Saint after his accident on numerous occasions.  He is not the viable young man that he was.  He is "a little aloof."  He is not the vibrant young man that would have become an engineer and "he's not capable of doing it now."  (Tr. at 206).

Dr. Robert P. Wolf testified by video deposition transcript.  He is a vocational and economic consultant with numerous degrees, including a doctorate in these fields.  Dr. Wolf prepared a vocational economic loss report for Thomas Saint (Plf. Ex. 8).  He was retained to determine the earning capacity losses of Thomas Saint as a result of the injuries sustained in the June 7, 2002 accident.  In this regard, he reviewed the collective bargaining agreement (Plf. Ex. 10), and the letter from Local 30 (Plf. Ex. 11).

From these documents and discussions with the Saint family, he determined that Thomas would have completed his apprentice training some time in 2004 and then, as an engineer he would have earned $78,618 per year based on an hourly rate of $29.60. Also, there were fringe benefits of about 32 percent of his earnings, with regard to basic medical, major medical, pension and annuity. Also, he reduced the total amount of loss of earnings by the sum of $160,000 for the probability that there would be periods of unemployment and would not work to age 67. In addition, he added a three percent growth rate between 2005 and 2049. His total amount for Saint's lost expected earnings and fringe benefits from 2002 to 2049 is the sum of $7,600,102, in future inflated dollars.

Dr. Wolf also estimated the life care cost, namely, supervision of Saint for 24 hours a day, seven days a week, from the year 2005 to age 76.3 at $148,512 per year times 53.68 years with three percent growth per year in the total sum of $18,335,885. Thus, Dr. Wolf's total figure for loss of earnings and supervision for life is the sum of $25,935,987.

On cross-examination, Dr. Wolf testified that his figures are computed on the assumption that Thomas Saint has been totally disabled from the date of the accident and will remain so totally disabled for the remainder of his life. Also, he conceded that he did not discount to present value his estimated loss of income figures. Also, Dr. Wolf did not deduct the amounts that Saint is currently receiving from social security disability. He says that this is a collateral source

issue.  In addition, Dr. Wolf did not do any computations with regard to the payment of income taxes on the alleged future loss of wages and benefits.  Also, he has included 48 days of overtime per year on the basis of time and a half in his computations, based on the letter from Local 30.

Further, the life care estimated costs of $18,335,885 were also not reduced to present value.  Dr. Wolf testified that he included supervision figures on a 24 hour, 7 days a week, round-the-clock basis, based on Eve Saint's statements to him and a review of Dr. Ng's reports.  However, from his review of the records and the interview with the Saint family in his office, Dr. Wolf testified that Thomas is probably capable of reading books and may have the cognitive ability and the social skills to be able to play cards.

   (2)     <u>The Defendant's Case on Injuries and Damages</u>

The final defense witness was Dr. Arthur Rosen, a board certified neurologist.  He was retained by the United States to review Saint's medical records, perform an examination and prepare a report, which was received in evidence as Defendant's Exhibit L.  Dr. Rosen testified that Thomas Saint had a motor vehicle accident and sustained a severe closed head injury and a variety of secondary neurological complications.  When he first came into the Nassau County Medical Center, he was comatose which is a cardinal manifestation of a severe closed head injury, with abnormalities of his pupils and then had a generalized seizure in the emergency room.  At the Southside Hospital on a CT

scan they found a right subdural hematoma and subsequently he apparently fell of a stretcher and developed a left subdural hematoma. However, no surgery was ever needed. Saint also had an acute psychiatric episode and was depressed and suicidal because of his losing his girlfriend a week prior to the accident.

Saint was admitted to St. Johnland in the third week of October 2002 in a severe neurological status. Dr. Rosen testified that his condition dramatically improved at St. Johnland. In a neuropsychological screening evaluation, dated October 23, 2002 (Dft. Ex. M), Saint was described as remarkably well, given the history of his severe head injury as follows:

> Q    What does it indicate about Mr. Saint's condition on October 23rd, 2002?
>
> A    It describes him as remarkably well, given the history of his head injury.
>
> More specifically, it found that he was alert, he was oriented, he had normal language and normal attention. They did note some mild memory impairment.
>
> He had normal visual motor skills. He had some mild impairment of mental calculations. He was able to add. He had difficulty with subtraction and division.
>
> His reasoning and higher cognitive functions appeared to be relatively normal.
>
> In terms of problem solving, he did have some difficulty with abstract concepts.
>
> Emotionally, the psychologist noted his affect attended to be flat, but at times it was quite appropriate.
>
> Q    Given his condition when he was admitted to Nassau, how

would you characterize his state as reported in Defendant's Exhibit M?

A    Remarkably improved.

Tr. at 390-391.

Dr. Rosen examined Thomas Saint on June 24, 2005, three years after the accident. His initial reaction: "Well, he looked a lot better than I had anticipated even despite the St. Johnland report . . . I was quite surprised, pleasantly surprised." (Tr. at 392). Dr. Rosen found the patient to be alert, oriented as to time, place and person, with no language problems. There was no aphasia (translating thoughts into words) and no slurring of speech. He had some problems remembering.

Saint correctly interpreted the problem, "people in glass houses shouldn't throw stones." His mood was a little depressed, but it was appropriate for a young man who had been through such difficulties. He did some mental calculations such as addition and subtraction, and "he did that quite well." (Tr. at 395). He did seem to be a little easily distracted, and wanted to show Dr. Rosen his exercise machine and the books on the shelf. Saint used a Bowflex exercise machine every day or a few times a day. Physically, Saint looked pretty good. He was able to ambulate but had a problem with the muscles of his left upper extremity. He walked slowly but without any obvious weakness. His pupils, the nerve in back of the eye, his visual fields, the six muscles that move the eyes from side to side and up and down, and the 12 cranial nerves, were all normal. Also,

his reflexes, his ability to perceive sensations and his coordination in his upper and lower extremities were all normal. His Romberg Test with closed eyes was "solid as a rock." (Tr. at 397). He did walk slowly with his left arm flexed at the elbow. Dr. Rosen concluded his examination, as follows:

A     So, the only positive things on that examination were some problems, mild problems, with short-term memory, some distractibility, some problems with strength in his left upper extremity.

Aside from that, he was pretty good.

We had a very pleasant conversation. I asked him what he does with his time, and he told me that he likes to watch television and he plays cards with his friends, although he says he doesn't win very often.

Q     Can I stop you there.

What's the significance of playing cards?

A     It requires a certain amount of concentration and, depending upon the game, some mathematical skills.

Q     What does that indicate about memory?

A     It requires a certain amount of memory.

And he told me that he liked reading. I asked him what he read, and he showed me the books, some books on his bookshelf, and he specifically pointed out to Men in Black, Five People You Meet in Heaven –

*     *     *     *

A     Okay. He reads books. He was very proud of the fact that he reads books. And I asked him what was the book he most recently read, and he told me and pulled them off the shelf; Men in Black, the Five People You Meet in Heaven, and The Light That

Saved Me.

He went on talking a great deal about that latter book, The Light That Saved Me. He thought it was wonderful, he thought it was inspirational.

Not having read it, I couldn't question him about it, but he told me about it. I don't remember the details. He told me about the book and what it was about and he was really very excited and, in fact, rather animated in describing it.

It was clearly, for him, he felt it was inspirational and that was very nice to hear.

Q        I want to go back to a point where maybe we went faster than we should.

I asked you about the significance of playing cards. Can you repeat what you said?

A        To play cards – and it depends upon the game that you're playing – but it requires memory, it requires calculation, and it requires, I guess, if you're playing poker, it requires a certain social ability to bluff the other people. Not being a poker player, that's what I'm told it requires.

Tr. at 397-399.

At the conclusion of his examination, Dr. Rosen reached certain determinations. It is set forth in his report in evidence (Dft. Ex. L). His conclusion as to the medical condition of Thomas Saint on June 4, 2005 is as follows:

Q        Can you tell us your conclusion?

A        Well, that is that he had a significant closed head injury and that he had made a rather remarkable recovery, and that at the time of my examination, which was in June of 2005, he had some evidence of mild cognitive problems and some mild weakness of the

muscles in his left arm.

I felt that he was mildly depressed and suffering from an ongoing adjustment disorder, which is not unexpected, and I had made some recommendations about perhaps what I thought would be done in the future with him and perhaps shouldn't have been in there. I made some recommendations that were inappropriate. I felt I should put them in any way, about how he should be managed from a neurological point in the future.

I thought that he should have repeat neuroimaging studies to assess the hematomas and to see if there were any other issues related to the closed head injury that might cause some problems in the future.

Tr. at 402.

The cross-examination of Dr. Rosen concentrated on whether Thomas Saint could return to any kind of work. It was pointed out that there was nothing on the St. Johnland report of October 23, 2002 (Dft. Ex. M) about any prognosis for future employment. Dr. Rosen didn't speak to Eve Saint about the things Thomas told him. He felt it would not be appropriate because of the ongoing litigation and his concern whether, as his mother, she would be accurate in relating his symptoms because of emotional overlay.

With respect to Saint's ability to return to any type of employment in the future, Dr. Rosen was questioned about the opinion of Dr. Ng in his report of April 11, 2005 (Plf. Ex. 1). In that report Dr. Ng stated the following:

Based on the description above, Mr. Saint's prognosis for future recovery and reintegration into community is poor. Because of his visual and cognitive problems, he has been unable to return to driving. He will likely never be able to return to productive employment because of his cognitive and behavioral problems.

Dr. Rosen testified that he reached no such conclusion and in his report he did not refer to loss of future employment. However, in Court, he did state his opinion as to the future employment status of Thomas Saint:

Q      Now, in his report, Dr. Ng also says because of his visual and cognitive problems, he has been unable to return to driving, and he concludes he will likely never be able to return to productive employment because of his cognitive and behavioral problems; do you agree with that?

A      No.

Q      Why not?

A      I think there are some types of jobs, particularly in structured environments, that he would be quite capable of doing.

I know he was an apprentice before this accident occurred for some sort of engineering position, and I doubt that he could return to that, but I think he could return to work in structured environments.

I've seen people with far more cognitive deficits than [sic] are working in structured environments and supporting themselves.

Q      What's a structured environment?

A      A structured environment is one where you come in, you're given a job, and you know what your expectations are, and there are people in management that kind of guide you through this.

Many of these are assembly line type work. Most of them are assembly line type work.

\*    \*    \*    \*

Q      What is the basis upon which you opine that Mr. Saint could do structured work in a structured environment?

**A**      Based upon my experience over 40 years in dealing with individuals with this level of cognitive problems from a variety of issues, including closed head injuries, and based on that experience it is my strong feeling that he could function in a structured environment.

Then issues that were raised about the possibility of his having emotional outbursts and being a danger to himself and a danger to others, I did not see that, and I don't believe that exists to any significant extent.

And part of being board certified in neurology is to pass competency examinations in psychiatry and, in fact, the certifying board is the American Board of Psychiatry and Neurology. It's a combined board.

And so I do feel that I have some degree of expertise in dealing with people with emotional issues and I did not feel that Mr. Saint's emotional issues would preclude him from functioning in a structured work environment.

**Q**      Was Mr. Saint cooperative with you during the examination?

**A**      Very.

Tr. at 414-415, 417.

In addition, Dr. Rosen testified that Thomas Saint does not need supervision in his daily life.

**E)      <u>Where Was Thomas Saint?</u>**

Of concern to the Court was the absence from the trial of Thomas Saint. While it is understandable that his mother did not want him to hear some of her testimony and the medical opinions, he could have been produced for a short time. The Court was anxious to see him and to hear how he was progressing. His

53

testimony, and/or even his appearance would have assisted the Court in resolving some of the disputed damages issues, such as (1) his present condition; (2) his future ability to be employed; and (3) his need for constant or even intermittent supervision.

One of the reasons advanced by Mrs. Saint for his absence was that he would be angry and agitated in court and "the guards would have had to sit there and jump on him to control him." (Tr. at 34). In the Federal Court, it is not unusual for a litigant in a civil or criminal case to be potentially violent. There are marshals and court security officers available in such situations. The failure of the plaintiff to even appear in the courtroom is a factor which the Court must consider in making these damages determinations.

## IV. AWARD OF DAMAGES

### A) Injuries and Pain and Suffering Incurred to the Present Date

In this accident, Thomas Saint sustained a severe closed head brain injury, including a subdural hematoma, unconsciousness for a lengthy period and seizures. He also sustained brain damage sequella including vision problems and post-traumatic stress disorders. In addition, Saint sustained a fracture of the clavicle which required little treatment. He also had psychological trauma and depression, anxiety and feelings of hostility.

A review of the precedents is always helpful. In the federal court, in *Rangolan v. County of Nassau*, 370 F.3d 239 (2d Cir. 2004), the plaintiff, an inmate

with a long-term prison sentence, sustained a severe brain injury and a depressed fracture of the skull requiring emergency brain surgery.  He was in a coma for six days and had and will have seizures; and personality disorders.  The jury verdict of $300,000 for past pain and suffering was affirmed by the Second Circuit. *Id.* at 245-46; *see also Kovit v. Estate of Katherine Hallums*, 307 A.D.2d 336, 763 N.Y.S.2d 325 (2d Dep't 2003), *rev'd on other grounds*, 4 N.Y.3d 499, 829 N.E.2d 1188, 797 N.Y.S.2d 70 (2005) (an award for past pain and suffering with regard to an above the knee amputation reduced from $5,000,000 to $2,000,000, was affirmed); *Reed v. City of New York*, 304 A.D.2d 1, 757 N.Y.S.2d 244 (1st Dep't 2003) (the plaintiff suffered from multiple skull fractures, subdural hematoma, occipital contusions with tissue loss; memory loss; progressive brain atrophy and numerous serious residuals including seizures.  A jury verdict of $2,500,000 for past pain and suffering was affirmed); *Ramirez v. City of New York*, 279 A.D.2d 563, 719 N.Y.S.2d 289 (2d Dep't 2001) (the plaintiff sustained permanent brain damage as a result of an assault by police officers.  A jury verdict of $200,000 for pain and suffering was affirmed on appeal).

For all of the injuries and the pain and suffering sustained by Thomas Saint, to the present date, the Court awards the sum of $1,000,000.

B)      **Pain and Suffering in the Future**

According to the evidence presented, the last doctor to have examined Thomas Saint on his behalf was Dr. Wing Ng, who last treated him in September

2002 and subsequently briefly examined him for this litigation on April 11, 2005. There has been no more recent examination and report. According to Dr. Ng, Saint is suffering from emotional and cognitive problems; has occasional bouts of uncontrolled angst and has been unable to drive. On the other hand, Dr. Rosen, who examined Saint on June 27, 2005 stated that Saint suffered a significant closed head injury "and has made a remarkable recovery . . . with mild cognitive difficulties and mild weakness of the proximal muscles in his left arm . . . [and] is mildly depressed and likely suffering from an ongoing adjustment disorder."

This evaluation as to future pain and suffering is rendered more difficult by the fact that Thomas Saint never appeared at the trial. He is similar to the proverbial "missing party." The Court was unable to observe him walking, talking or to evaluate his emotional state and his demeanor. This is especially troubling in this bench trial. Also, it is significant that Saint has apparently undergone no treatment for several years and was apparently never seen by a psychiatrist or psychologist.

A review of the appellate cases involving future pain and suffering is of assistance. In *Rangolan*, 370 F.3d 239, as stated above, inmate Rangolan sustained a depressed fracture in the right temporal region; his skull was broken and pushed into his brain causing cerebral hemorrhaging and emergency surgery. He was in a coma for six days, he sustained a cerebral concussion,

cerebral encephalopy and seizures. His physician testified that the brain damage and seizures were permanent and only the frequency of the seizures could be treated. The jury awarded the plaintiff the sum of $1,250,000 for future pain and suffering, which was reduced by this Court, post-trial to the sum of $500,000, which was affirmed by the Second Circuit. *Id.* at 245-46; *see also McKithen v. City of New York*, 292 A.D.2d 352, 738 N.Y.S.2d 856 (2d Dep't 2002) (plaintiff was attacked and stabbed in the back and suffered from permanent post-traumatic stress disorder. A jury verdict of $880,000 was reduced on appeal to the sum of $500,000, as "reasonable compensation for future pain and suffering."); *Ramirez,* 279 A.D.2d 563, 719 N.Y.S.2d 289 (where there was uncontroverted evidence that the plaintiff sustained permanent brain damage as a result of an assault by police officers, a jury award of $500,000 for future pain and suffering was affirmed).

For all the pain and suffering and emotional distress to be suffered by Thomas Saint in the future, the Court awards the sum of $500,000.

However, this sum must be reduced to its present value. *See Oliveri v. Delta*, 849 F.2d 742, 751 (2d Cir. 1988) ("We have concluded that the appropriate course is to accept the concept of discounting awards for non-pecuniary losses, but to forgo the precision appropriate for discounting future earnings. . . . That should be done by the same fact-finder that determines the amount of the award, without any precise mathematical adjustments."); *Estevez v. United States*, 72 F. Supp. 2d 205, 211, 214 (In FTCA case, reducing damages awards for future pain

and suffering by a discount rate of 2% per year, for a maximum of ten years pursuant to New York law); *see also* N.Y.C.P.L.R. 5041(e) ("[T]he period of time used to calculate the present value for damages attributable to pain and suffering shall be ten years or the period of time determined by the trier of fact, whichever is less.").

Therefore, the attorneys are requested to compute and relate to the Court their view of the reduction to present value. They are requested to present their computation to the Court in no more than a three-page letter within ten (10) days of the date of this decision.

C)    <u>Loss of Earnings to Date</u>

At the time of the accident Thomas Saint was a first year apprentice engineer and a member of Local 30 of the International Union of Operating Engineers. By the year 2005 he probably would have graduated from the apprentice program and would have been earning $78,618 per year. According to the report of Robert Wolf, the vocational expert (Plf. Ex. 8), Saint lost earnings to date as follows:

|       |                        |
|-------|------------------------|
| 2002  | $19,583 (partial year) |
| 2003  | $35,644                |
| 2004  | $76,545                |
| 2005  | <u>$78,618</u>         |
| TOTAL | $210,390               |

If the earnings for years 2006 at $78,618 and to June 1, 2007 at $39,306 are added to the above sum, then the total loss of earnings as an engineer would be the sum of $328,314.

Therefore, the loss of earnings sustained by Thomas Saint to June 1, 2007, is the sum of $328,314. From this sum of $328,314 must be deducted the social security disability benefits received by the plaintiff. *Bryant v. New York Health & Hospital Corp.*, 93 N.Y.2d 592, 695 N.Y.S.2d 39 (1999). At the trial Eve Saint testified that her son receives monthly social security disability benefits of approximately $1000 per month or $12,000 per year. For the approximately five and a half years of social security disability payments, the sum of $66,000 should be deducted from the loss of earnings, leaving the net sum of $262,314.

D)      <u>Future Loss of Earnings</u>

According to the Bureau of Labor Statistics of the United States Department of Labor, Table of Working Life for Men, Thomas Saint, at age 24, would have a prospective working life of 34 years. This item of damages is particularly difficult to reasonably estimate. The Court credits the testimony of Dr. Rosen that Thomas Saint is capable of working at "some type of job, particularly in structured environment . . . a structured environment is one where you come in, you're given a job, and you know what your expectations are, and there are people in management that kind of guide you through this. Many of these are assembly line type work." (Tr. at 415).

In making this particular damages evaluation as to future loss of earnings, the Court is again concerned with two important missing factors. First, there has been no evidence with regard to recent medical treatment. The plaintiff's lone medical witness, Dr. Ng, last treated the plaintiff in September 2002 and then examined him in March 2005 for the purpose of this lawsuit. So that the Court does not have any recent evidence of his current medical condition. Second, again the question of the non-appearance of Thomas Saint looms largely as to this measure of damages. It would have been helpful for the Court to see and hear from Saint himself as to his ability to work in the future.

It is well-settled that loss of future earnings is a legitimate item of damages, even where the computation of such damages is necessarily "fraught with difficulties." *Sullivan v. Locastro*, 178 A.D.2d 523, 527, 577 N.Y.S.2d 631 (2d Dep't 1991). However, an award for future loss of earnings may not be based on speculation. *Davis v. New York*, 264 A.D.2d 379, 693 N.Y.S.2d 270 (2d Dep't 1999), *amended on other grounds*, 1999 WL 637163; *Eichler v. New York*, 196 A.D.2d 524, 601 N.Y.S.2d 318 (2d Dep't 1993). Such an award must be established with reasonable certainty. *Novko v. State*, 285 A.D.2d 696, 728 N.Y.S.2d 259 (3d Dep't 2001).

In this case, the plaintiff's proof by Kenneth J. Williamson and Robert Wolf is that, with reasonable certainty, Thomas Saint would have become a licensed engineer in 2004 and that he would have earned $78,618 per year

commencing some time in 2004.

As stated above, the Court also credits the testimony of Dr. Rosen that Saint was capable of working at some kind of structured job, perhaps in a factory. With reasonable certainty, in any such position in the future years, factoring in inflation, Saint would be earning at least $40,000 per year. Where the injured person returns to work after an accident, but in a different lower paid job, if the earnings in the new employment would be less than the earnings in his former employment, he can recover such a loss of future earnings. *See Johnson v. Danly Machine Specialties*, 183 A.D.2d 592, 584 N.Y.S.2d 26 (1st Dep't 1992).

Therefore, as a result of his injuries, Saint would be losing approximately $38,000 per year in the future. With a work life expectancy of 34 years, the total estimated loss of income in the future would be the sum of $1,292,000. There is no need to adjust this figure as a result of possible wage increases; lapses in employment; layoffs; or inflation. These factors would roughly negate any substantial increases or deductions.

Accordingly, for the loss of earnings in the future of Thomas Saint, the Court awards the sum of $1,292,000.

This sum must also be reduced to its present value. *See, e.g., McCrann v. United States Lines Inc.*, 803 F.2d 771, 773 (2d Cir. 1986). Therefore, the attorneys are requested to compute and relate to the Court their view of the reduction to present value. They are requested to present their computation to the Court in

the same three-page letter referred to previously within ten (10) days of the date of this decision.

E)    <u>Past Medical Expenses</u>

Based on the uncontroverted testimony of Eve Saint as to the medical bills for Thomas Saint incurred to 2004, and the bills introduced in evidence (Plf. Ex. 13), the Court awards the sum of $550,000 for the past medical expenses of Thomas Saint.

F)    <u>Future Medical Expenses</u>

The plaintiff has adduced no evidence of future medical expenses.  In fact, the last medical treatment offered at the trial was an examination by Dr. Winterhorn on February 23, 2004.  In the absence of any such evidence, the Court makes no award for future medical expenses.

G)    <u>Future Supervision</u>

Much has been said by Mrs. Saint and counsel for the plaintiff of the need for 24 hour, 7 day a week future supervision for Thomas Saint.  There is no such credible evidence in this case.  It is clear that to the present date there has been no professional supervision for Thomas Saint and no money has been expended for supervision for Saint to the present date.  Whatever supervision was required, if any, was done by his family.

Q      Ms. Saint, when you're not watching him, do you pay anyone to watch him?

A      I can't afford it.  People just do it because they like us.

**Q**      Have you ever paid anyone to watch him?

**A**      No, I never had to.

Other than his mother's testimony, the only evidence that Thomas Saint will require paid professional supervision in the future, was in the testimony of Dr. Ng who stated that Saint does not require 24 hour supervision, but needs supervision on an intermittent basis.  Thus, there is no credible evidence that Thomas Saint will need professional paid supervision in the future.  It is significant that he has had none in the more difficult times in his life after the accident.  As stated in *Kavanaugh v. Nussbaum*, 129 A.D.2d 559, 514 N.Y.S.2d 55, 59 (2d Dep't 1987):

> We conclude, however, that the trial court properly set aside the award of $600,000 for future institutional custodial care.  Although the plaintiffs proffered testimony regarding the cost of such care, they simply failed to establish, by a preponderance of the credible evidence, the necessity of such care for the infant plaintiff.  Indeed, the plaintiffs' medical expert testified that although institutional facilities were available, the infant plaintiff's disability was much less severe than that of the average person in those facilities, and he could continue to live under the supervision of a parent or relative so long as such a person was available to care for him.  Thus, the jury's award for future care is based upon "uninformed speculation" (*see Buggs v. Veterans Butter & Egg Co.*,, 120 A.D.2d 361, 502 N.Y.S.2d 12) and cannot be permitted to stand.

In the Court's view, the plaintiff has failed to prove, by a preponderance of the credible evidence, the necessity of future professional supervision for Thomas Saint.  Accordingly, the Court makes no award for future supervisory care.

## V.  AS TO THE CLAIM OF
## NATIONWIDE MUTUAL INSURANCE COMPANY

Under the terms of its no-fault insurance coverage, Nationwide paid medical benefits for Thomas Saint to the Nassau County Medical Center in the sum of $99,992.25.  (See Plf. Nationwide Exs. 30, 31, 32 and 33).  Accordingly, the Court awards the sum of $99,992.25 to Nationwide Mutual Insurance Company, subject to the apportionment of liability, and the Clerk of the Court is directed to enter judgment in that reduced amount in favor of the plaintiff Nationwide Mutual Insurance Company.

## VI.  CONCLUSION

The Court finds that the plaintiff Eve Saint proved, by a preponderance of the credible evidence, that the accident on June 7, 2002 at the intersection of Route 110 and the westbound Long Island Expressway, was caused by the negligence of both drivers, Thomas Saint and Mark Arbucci.  The Court further determines that the apportionment of liability for both causing the occurrence was Saint 85%, and Arbucci 15%.

In addition, the Court finds that the total amounts of damages with regard to the injuries to Thomas Saint, subject to the above apportionment, are as follows:

1.      Injuries and pain and suffering to date                    $1,000,000

2.	**Pain and suffering in the future**	**500,000**
	**(Less reduction to present value)**

3.	**Loss of earnings to date**	**262,314**

4.	**Future loss of earnings**	**1,292,000**
	**(Less reduction to present value)**

5.	**Past medical expenses**	**550,000**

**The Clerk of the Court is directed to enter judgment in favor of the plaintiff and against the defendant for 15 percent of the final total sum, after the Court has made the reduction to present value.**

**SO ORDERED.**

**Dated:**	**Central Islip, New York**
	**April 23, 2007**


	_____/s/_____
	**ARTHUR D. SPATT**
	**United States District Judge**